**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (610) 667-9029
esmith@brodsky-smith.com

*Attorneys for Plaintiff Jin Chun*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JIN CHUN, On Behalf of Himself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>JIVE SOFTWARE, INC., TONY ZINGALE, ELISA STEELE, MARGARET BREYA, STEVE DARCY, ROBERT FRANKFURT, PHIL KOEN, TOM REILLY, CHUCK ROBEL, GABRIELLE TOLEDANO, BALAJI YELAMANCHILI, WAVE SYSTEMS CORP., and JAZZ MERGERSUB, INC.<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1)    Violation of § 14(e) of the Securities Exchange Act of 1934<br><br>(2)    Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>(3)    Breach of Fiduciary Duties<br><br>**JURY DEMAND** |

Plaintiff Jin Chun ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.     Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Jive Software, Inc. ("Jive" or the "Company"), against Jive, and the Company's Board of Directors (the "Board" or the "Individual Defendants, and collectively with Jive, the "Defendants"), for violations of Sections 14(e) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company as a result of an unfair process for an unfair price, and to enjoin a Tender

Offer currently scheduled to expire on June 9, 2017, in which Wave Systems Corp. ("Parent" or "Wave"), a wholly owned subsidiary of ESW Capital, LLC (together with its subsidiaries and affiliates, ("ESW")), and Wave's wholly owned subsidiary, Jazz Mergersub, Inc. ("Merger Sub") will acquire each outstanding share of Jive common stock for $5.25 per share in cash, with a total valuation of approximately $462 million (the "Proposed Acquisition").

2.     The terms of the Proposed Acquisition were memorialized in a May 1, 2017 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").

3.     On May 12, 2017, Jive filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "14D-9") with the Securities and Exchange Commission (the "SEC") in support of the Proposed Acquisition.

4.     Defendants breached their fiduciary duties to the Company's stockholders by agreeing to the Proposed Acquisition which undervalues Jive and is the result of a flawed sales process. Post-closure, Jive stockholders will be frozen out of seeing the return on their investment of any and all future profitability of Jive.

5.     Notably, as evidenced by the 14D-9, the sales process leading up to the Proposed Acquisition was rife with inadequacies, including interference with certain activist stockholders and the decision of the Board to enter into exclusivity with ESW despite a competing party submitting a higher bid.

6.     Further, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, Company Board Members and executive officers will be able to exchange large, illiquid blocks of Company stock for massive payouts, in addition to receiving cash in exchange for certain outstanding and unvested options and/or other types of restricted stock units. Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Acquisition. All stated, Company insiders stand to reap millions in personal profits as a result of the Proposed Acquisition. Such large paydays upon the

consummation of the Proposed Acquisition, have clearly tainted the motivations of the Board in approving it.

7. Finally, in violation of sections 14(e) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially deficient 14D-9 on May 12, 2017 with the SEC in an effort to solicit stockholders to tender their Jive shares in favor of the Proposed Acquisition. The 14D-9 is materially deficient and deprives Jive stockholders of the information they need to make an intelligent, informed and rational decision of whether to tender their shares in favor of the Proposed Acquisition. As detailed below, the 14D-9 omits and/or misrepresents material information concerning, among other things: (a) the Company's financial projections; (b) the sales process of the Company; and (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor Morgan Stanley & Co., LLC ("Morgan Stanley"); and (c) the financial analyses performed by Morgan Stanley in support of the Proposed Acquisition.

8. Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed Acquisition or, in the event the Proposed Acquisition is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

**PARTIES**

9. Plaintiff is an individual citizen of the State of Virginia. He is, and at all times relevant hereto, has been a Jive stockholder.

10. Defendant Jive is a Delaware corporation and maintains its principal executive offices at 300 Orchard City Drive, Suite 100, Campbell, California 95008. Jive's common stock is traded on the Nasdaq under the ticker symbol "JIVE."

11. Defendant Anthony Zingale ("Zingale") is a director of Jive and Chairman of the Board. He previously served as Chief Executive Officer ("CEO") of the Company.

12. Defendant Elisa Steele ("Steele") is a director of Jive and the Company's CEO.

13. Defendant Margerat Breya ("Breya") is a director of Jive.

14.    Defendant Steve Darcy ("Darcy") is a director of Jive.

15.    Defendant Robert Frankfurt ("Frankfurt") is a director of Jive.

16.    Defendant  Phil Koen ("Koen") is a director of Jive.

17.    Defendant Thomas Reilly ("Reilly") is a director of Jive.

18.    Defendant Charles Robel ("Robel") is a director of Jive.

19.    Defendant  Gabrielle Toledano ("Toledano") is  a  director of Jive.

20.    Defendant Balaji Yelamanchili ("Yelamanchili") is a director of Jive.

21.    The defendants identified in paragraphs 11 through 20 are collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

22.    Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

23.    Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

25.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Jive's principle place of business is located in the Northern District of California, and each of the

CLASS ACTION COMPLAINT

Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Jive's common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

28.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. According to the Company's most recent 10-Q, as of May 3, 2017, there were more than 79 million common shares of Jive outstanding.  The actual number of public stockholders of Jive will be ascertained through discovery;

b.    There are questions of law and fact which are common to the Class, including *inter alia*, the following:

i.    Whether Defendants have violated the federal securities laws;

ii.    Whether Defendants made material misrepresentations and/or omitted material facts in the 14D-9;

iii.    Whether Defendants have breached their fiduciary duties; and

iv.    Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Acquisition is consummated.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.     Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

29.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Jive and owe the Company the duties of due care, loyalty, and good faith.

30.    By virtue of their positions as directors and/or officers of Jive, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Jive to engage in the practices complained of herein.

31.    Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.     act with the requisite diligence and due care that is reasonable under the circumstances;

b.     act in the best interest of the company;

c.     use reasonable means to obtain material information relating to a given action or decision;

  d. refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

  e. avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

  f. disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

32. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Jive, are obligated to refrain from:

  a. participating in any transaction where the directors' or officers' loyalties are divided;

  b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

  c. unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

33. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated, and are violating, the fiduciary duties they owe to Jive, Plaintiff and the other public stockholders of Jive, including their duties of loyalty, good faith, and due care.

34. As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Jive common stock in the Proposed Acquisition.

CLASS ACTION COMPLAINT

**SUBSTANTIVE ALLEGATIONS**

*Company Background*

35.     Jive provides communication and collaboration solutions to businesses, government agencies, and other enterprises.  The Company's Jive Platform allows companies to connect, communicate, and collaborate with employees, customers, and partners.  Jive's platform product offerings are delivered in two configurations, including Jive Internal for employee networks; and Jive External for customers and partner communities.  The Company also offers Jive recommendation engine, a user interface to track, consume, manage, and filter critical business information, communications, and actions; and developer's application programming interfaces and tools that enable bi-directional exchange of content, conversation, streams, and data between Jive and other systems.

36.     In addition, Jive provides Jive Anywhere that enables users to import content from a Web browser into the Jive platform.  Further, the Company's platform offers modules to integrate with the Jive platform, such as Enterprise Integrations, Gamification, Analytics, External Groups, Encryption at Rest, Ideation, Enhanced Disaster Recovery, Ideation, Jive Resonata, Mobile, Records Retention, and Video.  Additionally, the Company provides professional services, including strategy consulting, project management, technical expertise, and education and training.

37.     The Company sells its products and solutions through direct sales organization, as well as through resellers, implementation partners, outsourcing vendors, and system integrators.  Jive serves various industries, including consulting services, education, financial services, healthcare, life sciences, manufacturing, retail, telecommunications, and technology in the United States and internationally.

38.     Jive has shown sustained solid financial performance.  For example, a February 7, 2017 press release issued by the Company reporting its fourth quarter and fiscal year ended December 31, 2016 financial results showed such positive results as: total revenue for 2016 Q4 at $51.7 million, an all-time quarterly record for the company and a 3% year-on-year increase.  Furthermore, the financial results showed a 7% increase in gross profit for 2016 Q4 year on year.

39.     Speaking on these positive results, Company CEO Defendant Steele noted "Strong execution resulted in another quarter that exceeded our expectations as we achieved record revenue, continued to improve profitability, increased cash flow from operations and gained momentum across the business."

40.     Additionally, Defendant Steele spoke positively about the Company's future prospects, noting that, "Based on the transformation work we did in 2016 to realign the company, we are strategically poised for success as we enter 2017.  We have made great strides in our operational excellence initiatives, and have positioned Jive's unique value proposition in the market to solve the growing problems of digital fragmentation across the enterprise workplace."

41.     Despite this upward trajectory and glowing pronouncements by management, success, the Individual Defendants have caused Jive to enter into the Proposed Acquisition, thereby depriving Plaintiff and other public stockholders of the Company the opportunity to reap the benefits of Jive's present and future success.

***The Flawed Sales Process***

42.     The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants

43.     In April and May of 2015, Jive received inbound inquiries and engaged in preliminary conversations with representatives of two financial sponsors, "Party A" and Francisco Partners IV, L.P. ("Francisco Partners"), to discuss each such party's interest in either an investment or acquisition transaction involving the Company.

44.     On June 18, 2015, Bryan LeBlanc ("LeBlanc"), Jive's Executive Vice President and Chief Financial Officer ("CFO"), contacted a representative of Morgan Stanley to discuss long-term value creation scenarios and the potential retention of Morgan Stanley as Jive's financial advisor, in response to, in part, the receipt of the inquiries from Party A and Francisco Partners.

45.     On August 13, 2015, after Company management had previously met with representatives of Party A and Francisco Partners, the Board held a meeting, which was attended by Company management and representatives of Jive's legal counsel, Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini"), and Morgan Stanley.  At this meeting, representatives of Morgan

CLASS ACTION COMPLAINT

1   Stanley led a discussion with the Board on the Company's market position and potential strategic

2   alternatives.

3        46.     Also on August 13, 2015, Jive received an unsolicited inbound inquiry from a

4   potential strategic acquirer, "Party B" who expressed an interest in a potential acquisition of the

5   Company.  The Company responded that it was open to discussion and an introductory call

6   between the Company and Party B occurred on August 24, 2015.

7        47.     On August 21, 2015, Francisco Partners and certain of its affiliates filed a Schedule

8   13D reporting that they had acquired 5.6% of the outstanding shares of Jive common stock for

9   investment in the ordinary course of business.  The Schedule 13D was amended on September 22,

10  2015 and October 16, 2015 to report an increase of their holdings to 6.6% and 7.6%, respectively.

11       48.     On August 25, 2015, the Board held a meeting, which was attended by Company

12  management and representatives of Wilson Sonsini.  During such meeting, the Board discussed

13  the engagement of Morgan Stanley to serve as Jive's financial advisor in connection with a

14  potential strategic transaction.  Following this discussion, the Board authorized management to

15  finalize a customary engagement letter with Morgan Stanley, which was subsequently executed

16  on September 30, 2015.  The Board also discussed the status of discussions with Party A and

17  Francisco Partners and the inquiry from Party B.

18       49.     On September 18, 2015, the Company received an unsolicited inbound inquiry

19  from a potential strategic acquiror, "Party C".  On September 23, 2015, Company management

20  met with representatives of Party C to discuss a potential acquisition, investment or commercial

21  partnership.

22       50.     On October 6, 2015, Jive sent a proposed confidentiality agreement (an "NDA") to

23  each of Party A and Francisco Partners to facilitate further discussions and proposed scheduling

24  meetings with each of them.  The Company subsequently signed confidentiality agreements with

25  each of them.

26       51.     On October 29, 2015, a representative of Party C contacted the Company to further

27  discuss a potential acquisition, investment or commercial partnership.  The Company responded

28  that it was open to discussion but no substantive discussions with Party C immediately followed.

52.    In November 2015 and December 2015, representatives of each of Francisco Partners and Party A requested additional information from the Company, including financial projections prepared by Company management.  The Company held confidential management presentation sessions with representatives of each of them over the course of November 2015 and December 2015, in which the Company presented a further overview of the Company and its business segments and operations.

53.    On December 10, 2015, the Board held a meeting, which was attended by Company management and representatives of Wilson Sonsini and Morgan Stanley.  At that meeting, Defendant Steele presented the Company's proposed 2016 operating plan and the Board discussed the plan.  Representatives of Morgan Stanley updated the Board on the status of discussions with Francisco Partners and Party A and confirmed that no other third parties had recently contacted Morgan Stanley to express interest in the Company despite Francisco Partners' recent Schedule 13D filing.  Defendant Steele also confirmed that no third parties had contacted her either to express interest in the Company.  The Board discussed the appropriateness of providing Francisco Partners and Party A information on the Company's proposed 2016 operating plan and financial projections prepared by Company management, and subsequently shared with Francisco Partners and Party A.

54.    On January 7, 2016, Party A sent Jive a non-binding indication of interest to acquire the Company for $5.50 per share in cash.  Party A indicated that it would need to secure debt financing and requested Jive agree to three weeks of business diligence followed by three weeks of exclusivity while Party A completed its confirmatory due diligence and financing work.

55.    On January 8, 2016, Francisco Partners contacted a representative of Morgan Stanley to inform them that they did not intend to make an offer for an acquisition of the Company.

56.    On January 15, 2016, the Board held a meeting, which was attended by Company management and representatives of Wilson Sonsini and Morgan Stanley.  At that meeting, representatives of Morgan Stanley then updated the Board on the status of discussions with Francisco Partners and Party A, noting that based on conversations with Francisco Partners, it appeared unlikely Francisco Partners would submit a proposal to acquire the Company.

CLASS ACTION COMPLAINT

1   Representatives of Morgan Stanley led a discussion of the non-binding proposal recently received

2   from Party A and the Board discussed the proposal and whether to proceed with further discussions

3   and due diligence with Party A. The Board and Morgan Stanley discussed the likelihood that other

4   parties might have interest in the Company, and who those parties would likely be, based primarily

5   on strategic fit and investment interest in the Company's business generally.  The Board also

6   discussed the potential negative impact of a market check on Party A's interest in a transaction

7   with the Company, but generally agreed that Party A was unlikely to withdraw its proposal if the

8   Company did not respond immediately and conducted a discreet market check before making a

9   determination regarding Party A's proposal.

10         57.    In January 2016 and February 2016, representatives of Morgan Stanley contacted

11   8 potential strategic acquirors, including Party B, Party C and other potential strategic acquirors

12   "Party D" and "Party E", regarding a potential transaction with Jive.  On January 16, 2016,

13   Company management also reached out to a potential strategic acquiror, "Party F."  The Company

14   subsequently signed NDAs with 4 interested parties, including Party B, Party C, Party D and Party

15   F.  The Company also subsequently contacted four potential strategic acquirors who did not

16   express an interest in a potential transaction.

17         58.    On January 22, 2016, Company management held a meeting with representatives

18   of Party F, in which the Company presented an overview of the Company and its business

19   segments and operations.

20         59.    On February 9, 2016, representatives of Party A contacted representatives of

21   Morgan Stanley to inform them that, in light of the Company's fiscal 2015 fourth quarter financial

22   results, Party A would not reaffirm its previous preliminary non-binding proposal of $5.50 per

23   share in cash and that they would consider a transaction at $4.00 per share in cash, but would

24   consider raising their offer price if the Company's business recovered.  Morgan Stanley informed

25   Party A that the Board was unlikely to be interested in a transaction at $4.00 per share.

26         60.    Later on February 9, 2016, Company management met with representatives of

27   Francisco Partners, who indicated that they wanted the Company to continue to seek a strategic

28   transaction with a third party in order to maximize stockholder value.  Francisco Partners also

1   proposed that the Company cut costs and manage the business to maximize near-term profitability,

2   rather than investing in the Company's new products and platform transition.  Following that

3   meeting, and until the Merger Agreement was signed, the Company continued to engage with

4   Francisco Partners in their capacity as a significant stockholder of the Company but Francisco

5   Partners did not express interest in acquiring the Company.

6       61.    On February 16, 2016, Company management held a confidential management

7   presentation session with representatives of Party D, in which the Company presented an overview

8   of the Company and its business segments and operations.

9       62.    On February 23, 2016, Company management held a confidential management

10  presentation session with representatives of Party F, in which the Company presented another

11  overview of the Company and its business segments and operations.

12      63.    On March 8, 2016, Company management and representatives of Morgan Stanley

13  conducted a due diligence call with Party F, including a discussion of financial projections

14  previously reviewed by the Board.

15      64.    On March 8, 2016, Company management and representatives of Morgan Stanley

16  conducted a due diligence call with Party F, including a discussion of financial projections

17  previously reviewed by the Board.

18      65.    On March 8, 2016, Company management and representatives of Morgan Stanley

19  conducted a due diligence call with Party F, including a discussion of financial projections

20  previously reviewed by the Board.

21      66.    On March 8, 2016, Company management and representatives of Morgan Stanley

22  conducted a due diligence call with Party F, including a discussion of financial projections

23  previously reviewed by the Board.

24      67.    On March 8, 2016, Company management and representatives of Morgan Stanley

25  conducted a due diligence call with Party F, including a discussion of financial projections

26  previously reviewed by the Board.

27      68.    On April 21, 2016, the Board held a meeting, which was attended by Company

28  management and representatives of Wilson Sonsini.  At that meeting, Company management

CLASS ACTION COMPLAINT

1  updated the Board on the status of discussions with certain investors as well as potential strategic

2  acquirors and financial sponsors.  The Board then discussed the likely reaction of the interested

3  parties to the Company's cost planning and pending restructuring announcement.  The Board also

4  discussed the results of Morgan Stanley's outreach to various potential acquirors to date and the

5  timing of any discussions.

6        69.  Also on April 21, 2016, representatives of Party A verbally indicated to Morgan

7  Stanley that Party A would submit a written proposal for $4.75 to $5.00 per share in cash.

8        70.  On April 22, 2016, Company management spoke with representatives of Party A

9  to provide a preview of its fiscal 2016 first quarter financial results.

10        71.  On April 27, 2016, Company management and representatives of Morgan Stanley

11  spoke with representatives of Party F to discuss the Company's fiscal 2016 first quarter financial

12  results.

13        72.  On April 29, 2016, Party A submitted to Jive an updated non-binding indication of

14  interest to acquire Jive at a per share price in the range of $4.50 to $5.00 in cash.  Party A indicated

15  that it would need to conduct two weeks of diligence before submitting a final offer, followed by

16  four weeks of exclusivity while Party A completed its confirmatory due diligence and financing

17  work.

18        73.  On May 2, 2016, representatives of Party B contacted Company management to

19  ask whether the Company would be interested in a sale of Jive's social community software, Jive-

20  x.  Company management informed Party B that such a transaction was unlikely to be of interest

21  to the Board given the difficulty in structuring such a transaction.

22        74.  On May 5, 2016, the Board held a meeting, which was attended by Company

23  management and representatives of Wilson Sonsini and Morgan Stanley.  At that meeting,

24  representatives of Morgan Stanley updated the Board on the status of discussions with investors

25  and potential acquirors, including an update on the proposal from Party A.  After representatives

26  of Morgan Stanley left the meeting, Company management discussed the proposed restructuring

27  plan with the Board, including the desire to create a path to profitability for the Company and to

28

CLASS ACTION COMPLAINT

re-balance staffing levels to better align them with the evolving needs of the Company's business, and the restructuring plan was approved.

75.    On May 7, 2016, representatives of Morgan Stanley contacted Party A and suggested that they reconnect after the Company announced its fiscal 2016 first quarter financial results.

76.    On May 10, 2016, the Company announced its fiscal 2016 first quarter financial results as previously scheduled.

77.    On May 12, 2016, representatives of Party A contacted representatives of Morgan Stanley to inform them that, in light of the Company's fiscal 2016 first quarter financial results, they were only likely to offer a small premium to the current share price, expected to be around $3.80 per share in cash.

78.    Also on May 12, 2016, representatives of Party F contacted representatives of Morgan Stanley to inform them that, in light of the Company's fiscal 2016 first quarter financial results, it was no longer interested in a transaction with the Company.

79.    On May 13, 2016, the Board held a meeting, which was attended by Company management and representatives of Wilson Sonsini.  At that meeting, Company management updated the Board on recent discussions with an existing activist investor as well as Party A and discussed with Company management a strategy for engaging with Party A and any other potential acquiror that decided to approach the Company.

80.    On May 16, 2016, an existing investor of the Company contacted Charles Robel, a member of the Board, stating that it beneficially owned 4.6% of the outstanding shares of Jive, and urging the Company management and Board to proactively take action to unlock stockholder value, including a potential stock buyback program or a sale of the Company.  On July 7, 2016, the existing investor emailed a letter dated July 1, 2016 to Mr. Robel reiterating its position.

81.    On May 17, 2016, a representative of Morgan Stanley contacted Party A to inform it that its proposed price was unlikely to be of interest to the Board, but encouraged Party A to continue its due diligence.

CLASS ACTION COMPLAINT

82.     On May 19, 2016, LeBlanc met with a representative of Atlas Technology Group LLC ("Atlas"), financial advisor to ESW for a general discussion of the software market.  From July 2016 to December 2016, a representative of Atlas contacted a member of the Board with the intent of introducing the management team of Aurea Software, Inc., a wholly owned subsidiary of ESW Capital, LLC and an affiliate of Parent ("Aurea"), to the senior management of the Company, however no meeting was scheduled during that time.

83.     On September 9, 2016, Party A informed Morgan Stanley that it was not interested in an acquisition of the Company at the price range previously suggested by Morgan Stanley, but that the parties should reconnect in a couple months.

84.     On October 3, 2016, after an earlier introduction from Francisco Partners, Mr. Robel spoke with a representative of a potential strategic acquiror, ("Party G").  A confidential management presentation session was subsequently held on October 25, 2016.  Thereafter, on October 12, 2016, the Company signed an NDA with Party G, which did not include a "standstill" provision.

85.     From November 15, 2016 to December 7, 2016, Party G continued to conduct diligence.

86.     On November 28, 2016, a representative of Party A spoke with a representative of Morgan Stanley and indicated that Party A would be interested in an acquisition of the Company for $4.50 per share in cash, but not at $5.00 per share or above.

87.     On December 21, 2016, a representative of ESW contacted a representative of Company management to discuss a potential transaction with the Company.  Thereafter, on January 11, 2017, the Company signed an NDA with ESW, which did not include a "standstill" provision.

88.     On February 10, 2017, Party G submitted to Jive a preliminary non-binding proposal to acquire Jive at a price of $4.50 per share in cash, including a request for exclusivity until March 31, 2017.

CLASS ACTION COMPLAINT

89.     On February 19, 2017, after discussion amongst the Board, representatives of Morgan Stanley on the Board's request, contacted Party G and indicated that the Company would be willing to enter into exclusive negotiations at an offer price greater than $6.00 per share.

90.     Between January 2017 and February 2017, at the Company's request, representatives of Morgan Stanley contacted two potential acquirors, one strategic ("Party H"), and one financial ("Party I"), to determine interest in a potential transaction with Jive. Both parties expressed interest and entered into NDAs with the Company. The 14D-9 is silent as to the whether the NDAs contained standstill provisions.

91.     Also on February 21, 2017, the Company received a letter from Engine Capital LP, a stockholder of the Company, requesting a meeting with the Board and urging the Board to take action to unlock stockholder value by taking the Company private or otherwise selling the Company. On March 3, 2017, Company management and a member of the Board subsequently spoke with a representative of Engine Capital LP to discuss its concerns. The 14D-9 fails to give sufficient detail on the contents of this letter, and its affect, if any on the sales process.

92.     On February 27, 2017 and March 9, 2017, Party E and Party I, respectively, informed the Company they were no longer interested in a potential strategic transaction with the Company.

93.     On March 10, 2017, Morgan Stanley received an unsolicited inquiry from a potential strategic acquiror ("Party J"). However, Party J shortly thereafter indicated it was not interested.

94.     Also on March 10, 2017, the Company entered into a letter agreement with Engine Capital LP and certain other parties thereto and agreed to appoint Robert Frankfurt to the Board. The 14D-9 is silent as to the reasoning behind Defendant Frankfurt's appointment to the Board, or the effect of Engine Capital LP actions throughout the sales process.

95.     On March 20, 2017, Morgan Stanley delivered to Party G, Party H and ESW a timeline identifying, amongst other things, when the parties would receive a bid process letter, a draft merger agreement, and fiscal 2017 first quarter financial results, and when bids would be due. Morgan Stanley also encouraged the interested parties to complete their due diligence.

CLASS ACTION COMPLAINT

96.     On March 22, 2017, ESW submitted to Jive a preliminary non-binding indication of interest to acquire Jive at a per share price in the range of $4.50 to $5.25 in cash.  ESW indicated that it would use cash on hand or secure debt financing and did not request exclusivity at the time.

97.     On March 29, 2017, after a Board meeting discussing the sales process and at the Board's request, Morgan Stanley delivered a bid process letter to Party G, Party H and ESW, requesting best and final indications of interest, including a markup of the proposed merger agreement, by April 4, 2017.

98.     On April 3, 2017, Party G submitted to Jive an updated preliminary non-binding proposal to acquire Jive at a price of $5.20 per share in cash, including a request for exclusivity until April 28, 2017, with one-week extensions while negotiations were ongoing.  Party G declined to provide a markup of the Bid Process Merger Agreement.  Party G also indicated that it would require 3-4 weeks to complete its due diligence before entering into a definitive agreement.

99.     On April 4, 2017, ESW submitted to Jive an updated preliminary non-binding proposal to acquire Jive at a price of $4.50 per share in cash, including a complete but very light markup of the Bid Process Merger Agreement and a request for three weeks to complete lender and confirmatory due diligence.

100.    From April 9, 2017 to April 14, 2017, representatives of Wilson Sonsini and Morgan Stanley engaged with the three potential acquirors to elicit further proposals and to improve the terms of their material issues lists and markups of a draft of a proposed merger agreement.  Company management also met with Party H to facilitate its due diligence efforts.  Representatives of Morgan Stanley contacted Party G but Party G declined to increase its offer price or to submit a markup of the Bid Process Merger Agreement.  Representatives of Wilson Sonsini negotiated with Party G's legal counsel throughout the week in an effort to eliminate or mitigate the closing certainty issues reflected in Party G's material issues list.  Representatives of Morgan Stanley also informed ESW that it would likely need to propose an offer price at the high end of its initial range and demonstrate financial resources in order to be competitive.

101.    On April 14, 2017, ESW submitted to Jive a final non-binding proposal to acquire Jive at a price of $5.25 per share in cash, including detail regarding its ability to fund the proposed

acquisition without reliance on third party debt financing. ESW indicated that it had completed its business due diligence, so it would need only two weeks to complete lender and confirmatory due diligence and finalize a definitive agreement, but that it would withdraw its proposal if the Company did not accept the proposal and enter into exclusivity with ESW by April 17, 2017.

102.   On April 16, 2017, Party G submitted to Jive a final non-binding proposal to acquire Jive at a price of $5.35 per share in cash, with a request for 3 weeks of exclusivity, subject to a one-week extension. Party G's proposal included a revised material issues list that eliminated or mitigated a number of the terms that previously created meaningful closing risks to its proposal. Party G also withdrew its request for support agreements from some of the Company's largest stockholders not represented on the Board.

103.   Later on April 16, 2017, representatives of Morgan Stanley contacted ESW to inform it that it was not the top bidder and that the Board was concerned about ESW's need to rely on third party debt financing for an acquisition of the Company. ESW stated that it would not increase its offer price and would withdraw from bidding if it was not granted exclusivity by April 17. However, ESW provided back-up evidence (in the form of bank statements) of its ability to fund the entire purchase price without third party debt financing and assured Morgan Stanley that it would be in a position to sign a definitive agreement before May 1, 2017. ESW also indicated it would decrease the break-up fee in its proposal from 2.75% of equity value ($13 million) to $10 million.

104.   On April 17, 2017, following a Board meeting discussing the status of the sales process, the Company entered into an exclusivity agreement with the ESW terminating on April 30, 2017. This was done in spite of the fact that Party G's proposal was a higher monetary value than ESW's and that Party G had complied with all requests from the Company regarding submission of a list of material issues and support agreements.

105.   Between April 17 and April 29, 2017, the Company and its representatives and ESW and its representatives negotiated the terms of the Proposed Acquisition.

CLASS ACTION COMPLAINT

106.    On April 30, 2017, at a meeting of the Board, the Proposed Acquisition was discussed.  Morgan Stanley provided its oral fairness opinion, and thereafter the Board determined to enter into the Proposed Acquisition.

107.    On May 1, 2017, the Proposed Acquisition was executed by the Company and Wave Systems and subsequently announced via joint press release.

***The Proposed Acquisition***

108.    On May 1, 2017, the Company and Wave Systems issued a joint press release announcing that Jive had agreed to be acquired by Wave Systems in the Proposed Acquisition.  The press release states in relevant part:

> **CAMPBELL, Calif., May 1, 2017** – Jive Software, Inc. (Nasdaq: JIVE), today announced that ESW Capital, LLC, through its affiliate Wave Systems, is acquiring Jive and that Jive will become a part of the Aurea family of companies.  The transaction is valued at $462 million.  Under the terms of the agreement, an affiliate of Aurea will commence a tender offer for all of the outstanding shares of Jive common stock for $5.25 in cash per share.  This represents a premium of 20% to the average of Jive's closing stock price during the three months ending on April 28, 2017.  Jive's Board of Directors has unanimously approved the merger agreement and recommends that Jive stockholders tender their shares in the tender offer.
>
> "As the leader of the enterprise collaboration category, Jive has pushed the boundaries in how people work together for the past 16 years.  It's this focus and vision that has enabled us to deliver industry-leading product innovation, attract a top-notch customer base with recognized global brands and achieve record earnings and profitability in the last announced quarter," said Elisa Steele, CEO of Jive.  "With Jive and Aurea coming together, we can deliver the superior end-to-end employee and customer experience companies require in today's digital landscape."
>
> Aurea provides the technology platform and worldwide delivery capability to enable companies to build, execute, monitor and optimize the end-to-end customer journey across a diverse range of industries.
>
> "Jive, in combination with Aurea, enables us to bring customer experience and employee and customer engagement together.  We look forward to helping Jive clients get the maximum value out of their investment with Jive," said Scott Brighton, CEO of Aurea.  "Everything we do is driven by our singular core value of client success."
>
> Completion of the acquisition is subject to customary closing conditions, including a majority of the outstanding shares having been tendered in the tender offer and clearance under the Hart-Scott-Rodino (HSR) Antitrust Improvements Act of 1976.

The parties expect the transaction to be completed in June 2017. Following completion of the transaction, Jive's common stock will be delisted from the NASDAQ and deregistered from the Securities Exchange Act of 1934. Morgan Stanley is serving as financial advisor to Jive, and Wilson Sonsini Goodrich & Rosati, P.C. is serving as legal advisor to Jive. Atlas Technology Group LLC is acting as financial advisor to ESW Capital and its subsidiaries. Cooley LLP is serving as legal counsel to ESW Capital and its subsidiaries.

Additional details about the merger agreement will be contained in a Current Report on 8-K to be filed by Jive with the Securities and Exchange Commission.

***The Inadequate Merger Consideration***

109.    Significantly, analyst expectations, the Company's strong market position, extraordinary growth, positive future outlook, and synergistic benefits with Wave Systems establish the inadequacy of the merger consideration.

110.    First, the compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company. The proposed valuation does not adequately reflect the intrinsic value of the Company. Moreover, the valuation does not adequately take into consideration how the Company is performing, considering increases in revenues reported by the Company recent quarters of the past financial year.

111.    Notably, analyst coverage indicates a high target above the deal price, with analysts at Topeka Capital Markets, valuing the Company at $12.00 per share as recently as November of 2015, ***a value that is over 128% greater*** than the valuation offered to Plaintiff and other public stockholders in the Proposed Acquisition.

112.    Furthermore, the consideration offered in the Proposed Acquisition does not take into account the considerable synergies afforded to Wave Systems. Notably, Scott Brighton, CEO of Wave's parent company Aurea, stated in the press release announcing the Proposed Acquisition that, "Jive, in combination with Aurea, enables us to bring customer experience and employee and customer engagement together."

113.    Additionally, those in the media have noted the strong synergies that Wave Systems will receive, with Malia Spencer at the *Portland Business Journal*, noting in a May 15, 2017 article that ESW was the "big winner" of the Proposed Acquisition and that Jive will aid in Aurea's entry into "the collaboration and communication product line."

CLASS ACTION COMPLAINT

114.   Finally, Jive's future success is extremely likely.  As noted by Bruce Rogers in a March 6, 2017, *Forbes* article the collaboration software market space that Jive inhabits has seen a large amount of demand in recent years, which, coupled with the "highly fragmented" nature of the industry, will allow Jive to capitalize as a centralized platform to incorporate disparate tolls under one operating system.  Elsewhere in the article, Defendant Steele is quoted as stating that Jive has "grown like crazy" before, and expects to continue in the future.

115.   Obviously, the opportunity to invest in such Company on the precipice of success in strengthening its market presence is a great coup for Wave Systems, however it undercuts the foresight and investment of Plaintiff and all other public stockholders who have done the same.

116.   Moreover, post-closure, Jive stockholders will be completely cashed out from any and all ownership interest in the Company, forever foreclosing them from receiving any future benefit in their investment as Jive continues on its upward financial trajectory.

117.   It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Wave Systems at the expense of Jive and Jive's stockholders, which clearly indicates that Jive stockholders were not an overriding concern in the formation of the Proposed Acquisition.

***Preclusive Deal Mechanisms***

118.   The Merger Agreement contains certain provisions that unduly benefit Wave Systems by making an alternative transaction either prohibitively expensive or otherwise impossible.  Significantly, the Merger Agreement contains a termination fee provision that requires Jive to pay up to $10 million to Wave Systems if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Jive must pay this termination fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

CLASS ACTION COMPLAINT

119.    The Merger Agreement also contains a "No Solicitation" provision that restricts Jive from considering alternative acquisition proposals by, *inter alia*, constraining Jive's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an "*bona fide written and unsolicited Acquisition Proposal*" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

120.    Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide Wave Systems information in order to match any other offer, thus providing Wave Systems access to the unsolicited bidder's financial information and giving Wave Systems the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Wave Systems.

121.    Finally certain of the Individual Defendants and other members of Company management have agreed to enter into Tender and Support agreements, locking up a significant portion of the Company's stock to tender in support of the Proposed Acquisition, further constraining a rival bidder from being able to make an effective bid for the Company.

122.    Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition.

**Potential Conflicts of Interest**

123.    There is strong evidence that the Proposed Acquisition may be tainted by the self-interest of the Individual Defendants.  Certain insiders stand to receive massive financial benefits as a result of the Proposed Acquisition, as the large, illiquid chunks of shares currently held by certain Defendants and Company insiders will be exchanged for cash.

124.    In addition, under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding Company option, equity award, restricted stock unit, or other right to purchase Company stock will vest and be cancelled in exchange for the right to

1  receive the Merger consideration, instantly converting additional large, illiquid holdings of many

2  of the Individual Defendants and other Company insiders into cash

3        125.    For example, upon the consummation of the Proposed Acquisition, Defendant

4  Steele in particular stands to make over *five million dollars* from an exchange of her currently

5  owned stock and vesting of Company options and restricted stock units.  Other Company insiders

6  will receive similarly large payouts for their large, illiquid portions of Company stock as follows:

| Name | Number of Shares Owned [1] | Cash Consideration for Owned Shares ($) [2] | Shares Subject to Outstanding In-the-Money Options [3] | Option Consideration for In-the-Money Vested Options($) [4] | Option Consideration for Accelerating In-the-Money Unvested Options($) [5][6][7] | Number of Outstanding Restricted Stock Units [8] | Restricted Stock Unit Consideration for Accelerating Restricted Stock Units ($) [9][10] | Aggregate Cash Consideration ($) |
|---|---|---|---|---|---|---|---|---|
| *Directors* | | | | | | | | |
| Tony Zingale | 164,053 | 861,278 | 547,361 | 1,915,764 | — | — | — | 2,777,042 |
| Margaret Breya | 109,484 | 574,791 | — | — | — | — | — | 574,791 |
| Steve Darcy | 13,228 | 69,447 | 109,890 | 40,385 | 121,153 | 39,682 | 208,331 | 439,316 |
| Phil Koen | 15,152 | 79,548 | 124,224 | 83,269 | 158,968 | 39,772 | 208,803 | 530,588 |
| Robert Frankfurt | — | — | — | — | — | 38,461 | 201,920 | 201,920 |
| Tom Reilly | 133,322 | 699,941 | — | — | — | — | — | 699,941 |
| Chuck Robel | 152,582 | 801,056 | 120,000 | 288,000 | — | — | — | 1,089,056 |
| Gabrielle Toledano | 17,293 | 90,788 | 81,665 | 6,789 | 8,728 | 22,232 | 116,718 | 223,023 |
| Balaji Yelamanchili | — | — | 96,993 | — | 83,414 | 45,558 | 239,180 | 322,594 |
| *Executive Officers* | | | | | | | | |
| Elisa Steele* | 445,934 | 2,341,154 | 380,000 | — | 554,800 | 487,926 | 2,561,612 [11] | 5,457,566 |
| Ofer Ben-David | 144,838 | 760,400 | 120,000 | — | 175,200 | 191,250 | 1,004,063 | 1,939,663 |
| Jeff Lautenbach | 96,278 | 505,460 | 215,000 | 7,987 | 184,225 | 147,500 | 774,375 | 1,472,047 |
| Bryan LeBlanc | 142,065 | 745,841 | 961,029 | 3,615,311 | 219,000 | 120,594 | 633,119 | 5,213,271 |
| David Puglia | 38,811 | 203,758 | 250,000 | 13,161 | 126,125 | 71,250 | 374,063 | 717,107 |

20        126.    Furthermore, certain employment agreements with several Jive officers or directors

21  are entitled to severance packages should their employment be terminated under certain

22  circumstances.  These 'golden parachute' packages are significant, and will grant each director or

23  officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared

24  by Jive's common stockholders.  For example, Defendant Steele stands to make an additional *4.65*

25  *million dollars* in golden parachute compensation, on top of the more than *five million dollars* she

26  is set to receive as a consequence of the cashing out of her currently illiquid holdings in the

27  Company.

CLASS ACTION COMPLAINT

127.    The following table sets forth the Golden Parachute compensation for certain Jive directors and officers, as well as their estimated value payable:

| Name | Cash ($) [1] | Equity ($) [2] | Perquisites/ Benefits ($) [3] | Total ($) |
|---|---|---|---|---|
| Elisa Steele | 1,500,000 | 3,116,412 | 36,000 | 4,652,412 |
| Ofer Ben-David | 400,000 | 1,179,263 | 24,000 | 1,603,263 |
| Jeff Lautenbach | 400,000 | 958,600 | 24,000 | 1,382,600 |
| Bryan LeBlanc | 400,000 | 852,119 | 24,000 | 1,276,119 |
| David Puglia | 300,000 | 500,108 | 24,000 | 824,108 |

128.    Thus, while the Proposed Acquisition is not in the best interests of Jive's public stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete 14D-9***

129.    On May 12, 2017, Jive filed with the SEC a materially misleading and incomplete 14D-9 that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

<u>Omissions and/or Material Misrepresentations Concerning Jive's Financial Projections</u>

130.    The 14D-9 fails to provide material information concerning financial projections provided by Jive's management, reviewed with Jive's and relied upon by Morgan Stanley in its analyses.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

131.    The 14D-9 fails to disclose Jive's unlevered, after-tax free cash flows.

132.    Additionally, the 14D-9 also fails to disclose when and why the projections were updated during the lengthy sales process to reflect changes in the Company's business and/or financial results.

133.    Without accurate projection data presented in the 14D-9, Plaintiff and other stockholders of Jive are unable to properly evaluate the Company's true worth, the accuracy of

Morgan Stanley's financial analyses, or make an informed decision whether to tender their Company stock in the Proposed Acquisition.

_Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition_

134.    Specifically, the 14D-9 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Acquisition. In particular, the 14D-9 fails to disclose:

a.    The specific nature of the standstills provisions, including details related to any corresponding Don't Ask, Don't Waive ("DADW") provisions or fall-away provisions therein, entered into as part of NDA agreements between the Company on the one hand and Parties A-D, Francisco Partners, Parties F-I, and ESW, and whether those Standstills or NDAs are still in effect and were different in any way from one another;

b.    The timing and nature of communications regarding future employment and/or directorship of Jive's officers and directors, including who participated in all such communications;

c.    The effect, if any, that Francisco Partners had on the sales process after disclosing it's 7.6% stake in the Company, and if they, or their representatives, were included in any negotiations with any other interested party, including ESW or its affiliates;

d.    The identity of the "existing activist investor" discussed on p. 17 of the 14D-9, and the effect, if any, that it had on the sales process;

e.    The nature and contents of letter received by Engine Capital LP on February 21, 2017 as mentioned on p. 19 of the 14D-9, and the effect, if any, Engine Capital LP, had on the process, including through Defendant Frankfurt;

f.    The specific reasoning as to why the Board decided to enter into exclusivity with ESW rather than Party G, given that Party G's bid was higher; and

g.      The details of any conversations between and amongst the Board, Jive management, Party G or ESW regarding potential post-merger employment by Jive Board members of Jive management team members.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses Performed by Morgan Stanley*

135.    In the 14D-9, Morgan Stanley describe its fairness opinions and the various valuation analyses performed to render its opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

136.    For example, the 14D-9 does not disclose material details concerning the analyses performed by Morgan Stanley in connection with the Proposed Acquisition, including (among other things):

a.      *Public Trading Comparables Analysis*:

With respect to Morgan Stanley's Public Trading Comparables Analysis, the 14D-9 fails to disclose:

i.   the reason(s) why Morgan Stanley used street estimates for Revenue and EBITDA instead of the Company's own estimates for 2017 and 2018; and

ii.  whether Morgan Stanley performed any benchmarking analysis in relation to the other public compared companies.

b.      *Discounted Cash Flow Analyses*:

With respect to Morgan Stanley's Discounted Cash Flow analysis, the 14D-9 fails to disclose:

i.   the estimated future unlevered free cash flows of the Company used by Morgan Stanley in its analysis;

ii.  the definition of unlevered free cash flow;

CLASS ACTION COMPLAINT

      iii.  Morgan Stanley's basis for utilizing a discount rate range of 8.17% - 10.55%, including Jive's cost of capital; and

      iv.  the terminal values implied for the Company;

c.      *Selected Companies Analysis*

With respect to Morgan Stanley's Selected Companies Analysis, the 14D-9 fails to disclose:

      i.  The objective selection criteria and the observed company-by-company pricing multiples and financial metrics examined.

d.      *Precedent Premia Analysis*

With respect to Morgan Stanley's Precedent Premia Analysis, the 14D-9 fails to disclose the transactions used in the analysis and the premiums associated therewith.

e.      *Precedent Transactions Analysis*

With respect to Morgan Stanley's Selected Transactions Analysis, the 14D-9 fails to disclose:

      i.  The objective selection criteria and the observed transaction by transaction pricing multiples and financial metrics examined;

      ii.  The transaction value for each transaction listed; and

      iii.  The transactions excluded from the analysis because they were "not meaningful."

137.    Without the omitted information identified above, Jive's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Jive's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Acquisition is in their best interests.

CLASS ACTION COMPLAINT

# FIRST COUNT

## Claim for Breach of Fiduciary Duties

### (Against the Individual Defendants)

138.    Plaintiff repeats all previous allegations as if set forth in full herein.

139.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

140.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Jive.

141.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Jive by entering into the Proposed Acquisition through a flawed and unfair process and failing to take steps to maximize the value of Jive to its public stockholders.

142.    Indeed, Defendants have accepted an offer to sell Jive at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

143.    Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to tender their shares in support of the Proposed Acquisition.

144.    The Individual Defendants dominate and control the business and corporate affairs of Jive, and are in possession of private corporate information concerning Jive's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Jive which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

145.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

146.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Jive's assets and have been and will be prevented from obtaining a fair price for their common stock.

147.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

148.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Violations of Section 14(e) of the Exchange Act**

**<u>(Against All Defendants)</u>**

149.    Plaintiff repeats all previous allegations as if set forth in full herein.

150.    Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in favor of the Proposed Acquisition.

151.    Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

152.    The 14D-9 was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the 14D-9 is materially misleading and omits material facts that are necessary to render them non-misleading.

CLASS ACTION COMPLAINT

153.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

154.    The Individual Defendants were at least negligent in filing a 14D-9 that was materially misleading and/or omitted material facts necessary to make the 14D-9 not misleading.

155.    The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Acquisition.

**THIRD COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against all Individual Defendants and Wave Systems)**

156.    Plaintiff repeats all previous allegations as if set forth in full herein.

157.    The Individual Defendants and Wave Systems were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants and Wave Systems knew or should have known that the 14D-9 was materially misleading to Company stockholders.

158.    The Individual Defendants and Wave Systems were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants and Wave Systems were aware or should have been aware that materially false and misleading statements were being issued by the Company in the 14D-9 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants and Wave Systems were able to, and did,

control the contents of the 14D-9. The Individual Defendants and Wave Systems were provided with copies of, reviewed and approved, and/or signed the 14D-9 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

159. The Individual Defendants and Wave Systems also were able to, and did, directly or indirectly, control the conduct of Jive' business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants and Wave Systems knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the 14D-9 was misleading. As a result, the Individual Defendants and Wave Systems are responsible for the accuracy of the 14D-9 and are therefore responsible and liable for the misrepresentations contained herein.

160. The Individual Defendants acted as controlling persons of Jive within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Jive to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Jive and all of its employees. Additionally, Wave Systems also had direct supervisory control over the composition of the 14D-9 and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the 14D-9. As alleged above, Jive is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining the Proposed Acquisition;

CLASS ACTION COMPLAINT

C.      In the event defendants consummate the Proposed Acquisition, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Jive and obtain a transaction which is in the best interests of Jive and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: May 18, 2017

**BRODSKY & SMITH, LLC**

By:  */s/ Evan J. Smith*
Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:      (877) 534-2590
Facsimile:      (310) 247-0160

*Attorneys for Plaintiff Jin Chun*

CLASS ACTION COMPLAINT